THOMAS L. GEIGER *et al.* Appellees, *vs.* A. C. BARDWELL, Exr., Appellant.

*Opinion filed October 26, 1912.*

1. WILLS—*what does not constitute mental incapacity.* Neither old age nor feeble health constitutes mental incapacity to make a will, nor do both together, though combined with a defective memory and mental sluggishness.

2. SAME—*court should sustain legal trust if testator was mentally competent.* It is the duty of the court to sustain a legal trust created by will if the testator was mentally competent, even though all the beneficiaries of the trust desire to have it overthrown.

3. SAME—*when court will weigh the evidence in a will case.* In a will contest case, where the verdict is not directed but is returned by the jury on the merits, the Supreme Court, in reviewing the denial of the motion for new trial, will weigh the evidence, and will reverse the decree if the verdict is manifestly against the weight of the evidence.

4. PARTIES—*when contingent remainder-men should be made parties to suit to contest will.* Children of one of the *cestuis que trustent* under a will, who, if living at their mother's death, will take under the will a portion of the property devised and whose interests are not represented by the heirs who are seeking to set aside the will nor by the trustee, should be made parties to the suit.

APPEAL from the Circuit Court of Lee county; the Hon. OSCAR E. HEARD, Judge, presiding.

WINGERT & WINGERT, for appellant.

JOHN E. ERWIN, BROOKS & BROOKS, and DIXON & DIXON, for appellees.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Thomas L. Geiger filed a bill in the circuit court of Lee county to contest the will of his father, John L. Geiger, on the ground of mental incapacity. A trial of the issue was had, the court, on the motion of the executor, directed

a verdict in favor of the will, and a decree was entered dismissing the bill. On the appeal of the complainant that decree was reversed. (*Geiger* v. *Geiger*, 247 Ill. 629.) The widow and children of the testator, except the complainant, were made defendants and answered, confessing the allegations of the bill. After the remandment of the cause an order was entered on their motion permitting them to withdraw their names as proponents of the will and join with the complainant as contestants. On the second trial a verdict was rendered finding that the decedent was of unsound mind at the time of the execution of the supposed will and a decree was entered setting aside the probate, from which the executor has appealed.

On the former appeal the cause was considered as upon a motion to direct a verdict, on which only the evidence in favor of the contestant, in its most favorable aspect to him, was or could be considered. No opinion was intimated as to how, upon a consideration of all the evidence, the issue should be determined. The case is now before us upon the whole evidence as upon a motion for a new trial, and it is our duty to determine whether or not the verdict is manifestly against the weight of the evidence.

The testator, after providing for the payment of his debts, nominated A. C. Bardwell as executor, and disposed of all his property by the second, third and fourth clauses of his will, as follows:

"*Second*—I devise unto A. C. Bardwell, of the city of Dixon, in said Lee county, as trustee, all of my real estate .in the town of Nelson aforesaid, in trust for the uses and purposes following, to-wit: To lease the same on such terms as he may consider for the best interests of the beneficiaries, and keep the same so leased during the entire period of the trust herein established, and to pay over the net proceeds thereof as often as practicable, in the manner and on the conditions following: Unto my son Walter F. Geiger the net income of the south-east quarter of the

north-west quarter, the east half of the south-west quarter
and the north-west quarter of the south-east quarter of
section 14; unto my son Thomas L. Geiger, and unto my
daughter, Nellie Geer, each one-half of the net income of
the remainder of my real estate situated in said town of
Nelson. To continue so to lease said real estate during
the lifetime of my said children, respectively, deducting
from the gross income all proper charges and expenses
relating to the respective tracts for maintaining the respec-
tive premises and keeping them in a good state of preser-
vation, and paying the taxes and keeping buildings insured,
and re-building in case of destruction, together with rea-
sonable compensation for his services, and any and all
other proper charges in carrying out the trust, and to dis-
tribute the balance or net income as aforesaid: *Provided,*
no part or share of said income shall be liable, while in
the hands of the trustee, to the creditors of either bene-
ficiary, nor shall either have the power, in any manner
whatever, directly or indirectly, to mortgage, pledge, sell,
convey or in any way encumber or transfer his or her in-
terests in said lands or in the proceeds or income thereof,
but the share of each shall be paid directly by the trustee
to the respective beneficiaries entitled thereto, and shall not
be paid to any other person upon any written order or
verbal order nor upon any pretended assignment or trans-
fer thereof. On the death of my said son Walter such
trust shall terminate as to the tracts from which he is to
receive the net income as above, and the title thereto shall
descend in remainder in accordance with the laws of de-
scent then in force in this State. On the death of the first
to die of the two remaining beneficiaries, said trust, as to
an undivided one-half of the lands from which he or she
is to derive net income, as aforesaid, shall terminate and
the title to such undivided one-half shall descend in remain-
der in accordance with such laws of descent, and on the
death of the last survivor the trust shall come to an end

and the title to the remaining one-half shall descend in like manner.

"*Third*—All the rest and residue of my estate, of every kind and nature, I give, devise and bequeath unto my said children in equal portions, share and share alike, except that out of the share of my said son Thomas L. Geiger shall. be paid the sum of $1000 to my said daughter, so that she will receive that amount more than he. This is given her out of his portion in order to equalize my gifts to them, taking into account what I have done for each in the past. In case his share of the residue disposed of in this clause proves insufficient to pay her that amount, it is my will that the deficiency be paid her by my trustee, as soon as possible, out of the income going to my said son in pursuance of the foregoing clause.

"*Fourth*—I have made no provision for my wife because I anticipate that she will receive such share or interest in my estate as the law would give her in case I should. die intestate; and I also have in view the probability of her dower and homestead interests in my real estate being set off to her in acres, and I trust that if she elects to take her said interests in that form, her portion will be set apart to her by discreet commissioners, who, while doing justice by her, will make the division in a manner least prejudicial to the interests of the children."

This instrument was executed in August, 1906. The testator died in August, 1908. His heirs were the three children named in the will, of whom Mrs. Geer was about thirty-three years old at his death, Thomas twenty-seven and Walter twenty-one. He owned 325 acres of land in Nelson township, in Lee county, where he lived, 160 acres in Kansas, and some personal property. He had lived in Lee county more than fifty years before his death. When he first came there he worked at the carpenter's trade, and by economy and careful investment of his savings throughout his long life he accumulated the property he owned at

his death.   Besides this, his son Thomas had received from
him 320 acres of land in Nebraska, Walter 160 acres in
Kansas, and his daughter some lots in Dixon, on which he
had built a house.   He had suffered from eczema in his
right leg, below the knee, for many years, but it is not
claimed that this disease affected his mind in any way or
that it had any tendency to do so.   The same may be said
of an injury which he received in a runaway a few months
before making his will.   The claim of unsoundness of mind
has no other basis than the gradual wearing out of the
mental and physical powers by reason of age.   During his
lifetime it does not seem to have occurred to any one of
his family or neighbors that the testator was not compe-
tent to manage his business, and there is no evidence that
he did not do so until his death.   In the winter of 1905
and 1906 he went to Hot Springs, Arkansas, where his
son Thomas accompanied him.   He was quite feeble, and
at first was unable to take the baths and was wheeled about
in a chair.   He improved, however, and later did take the
baths and walked about by himself and once or twice was
lost.   It was during the following August that he executed
the will.   During the same month, or late in July, the Chi-
cago and Northwestern Railway· Company began negotia-
tions with him for a right of way through his farm and
finally filed a petition for its condemnation.   The contro-
versy was finally settled and Geiger made a conveyance of
the right of way to the company for $6000.   Afterward he
went to Kansas with two real estate dealers, taking his son
Walter with him, and there bought two quarter sections
of land, having one of them conveyed to Walter.

Six witnesses expressed the opinion that the testator
was of unsound mind,—Lonergan, Walzer, Wetzel, Greg-
ory, and two doctors.   Lonergan was a tailor, who in 1897
had a shop over Rosenthal's store, in Dixon, but in 1906
was in Hot Springs.   The testator bought his trousers at
Rosenthal's, and Rosenthal brought him up to Lonergan's

shop three or four times to be measured for alterations. Nine years after, Lonergan met the testator in Hot Springs and the latter failed to recognize him and did not remember being in his shop with Rosenthal. Lonergan wore a mustache in 1897 but not in 1906 and his hair was much grayer at the latter date. The testator did not want to talk, was nervous and forgetful, would start to answer when asked questions and say he forgot, and seemed a man all broken down to what he used to be. Lonergan thought him feeble and childish and not of sound mind.

Walzer was in the real estate business in Sterling, Illinois, had known the testator for thirty years, and before 1904 regarded him as a very conservative, close-figuring and honest man but not physically very strong. He came into Walzer's office on his return from the Kansas trip to wait for the interurban car and told Walzer he had been out to Kansas and had bought some land. He could not tell exactly where it was, did not remember the distance from town and referred several other things to Walter. Walzer says that from his observation of him during 1905, 1906 and 1907 he would think he was of unsound mind during those years. The only time, however, he testifies to seeing the testator during those years was that just referred to when the testator was returning from Kansas, though Walzer further testifies that he thinks he saw and talked with him one other time, of which he gives no account.

Wetzel also lived in Sterling and knew the testator fifteen years, during which he saw him eight or ten times. He saw him three or four times from 1905 until his death and saw him the morning he got back from Kansas, in Walzer's office. He says he would consider the testator's mind somewhat wavering at that time and would say it was unsound. He talked with the testator and tried to sell him insurance when he thought his mind was unsound, because he had the testator's name on his books, and he

would have renewed the insurance but the testator would not allow him to re-write the business. Geiger apparently understood this business, knew what he wanted, and his mind was not so wavering but that he had sufficient mental strength to resist the importunities of an insurance agent.

Gregory was the widow's brother and knew the testator for forty years. He has lived in Iowa since 1883 and had seen the testator about twice a year. He saw Geiger in the summer of 1905 and again in June, 1906, when he talked with him and noticed that he had failed very much. Geiger did not talk much but seemed to be disconsolate and discouraged and it was rather hard to talk with him. He would ask questions and seem to forget all about them in a little time. The witness formed an opinion at that time that the testator was very feeble both in mind and body and was of unsound mind. He asked Gregory how he rented his farm, and after the latter had explained it to him, in two or three hours asked the same question again.

Dr. M. M. Alden was an osteopathic physician, who resided in Dixon from 1901 to 1909. The testator, accompanied by his son Walter, called upon the doctor at his office in Dixon late in 1905 or early in 1906 and the doctor examined him for an hour or more for the purpose of determining the cause of the eczema in his leg, which was swollen and very sore. The doctor placed this sore leg in a machine which he called a "vibrator," and which was set in motion at the rate of 1000 or 1500 vibrations a minute, and he says that this would send the blood around through the limb very rapidly. Geiger seemed very slow in comprehending questions, many he did not answer, and often he would have Walter answer them. He seemed kind of absent-minded, lacked continuity of thought, and was what "we would call a case of quite advanced senility." He had a degeneration of the tissues of the body,— that is, the nervous tissues, the muscular tissues, and so

on, seemed to be sort of degenerated. The muscles were flabby, the blood in very bad condition, and the nervous system seemed to be in the condition of hardening. The doctor does not state how he ascertained this bad condition of the blood. He made no examination of it. The eczema was below the knee. The doctor testified that eczema is not a contagious or infectious disease and that erysipelas is not contagious or infectious; that some authors say that the latter is a germ disease and others that it is not. The vibratory treatment seems to have been all the doctor did for the testator at that time, and the visit was made soon after to Hot Springs. The doctor treated the testator again in the summer of 1908 and two or three months later he died. In the meantime the doctor had seen him and talked with him a number of times, and in his judgment the testator was of unsound mind. This opinion apparently had never been communicated to anyone, and this witness was not called upon to testify at the first trial.

Dr. Frank Andre did not testify at the first trial but did at the second. He is a physician living at Kenosha, Wisconsin. His acquaintance with the testator began on the train from St. Louis, on which both were traveling to Hot Springs, and ended with that visit, from which they returned to Chicago in the same stateroom of a sleeping car. They stayed at the same hotel during their six weeks' visit at Hot Springs, and at Walter's request the doctor examined Geiger, though he could not get him to answer questions, and what he learned about him was from answers given by the son and not himself. He describes the testator's physical condition and expresses the opinion that he was suffering from beginning senile dementia; that he was of unsound mind, and that such mental condition would be permanent and progressive. In answer to questions put to him on cross-examination he said that in his opinion Geiger was hopelessly of unsound mind, with no chance of recovery; that while it was possible it was not

probable that he could thereafter answer rationally any questions concerning his everyday life or as to his health, that he would be able rationally to examine and purchase land, talk rationally with his neighbors, or carry on rationally conversation with friends on topics of the day or on his health. The fact that the evidence shows that he did do all these things detracts from the value of the doctor's opinion.

Buckaloo, who was assessor in 1906, 1907 and 1908, testified that the testator, when he assessed him for those years, was unable to answer as to the number of cattle and quantity of grain on his farms and asked his son Thomas as to the number and quantity, though he answered the other questions. Ankeny and Buzzard were tenants of the testator, and neither expresses an opinion that he was of unsound mind and no fact in their testimony indicates it, though they say that he was failing, physically and mentally. The testimony of Geer and Godfrey tends to show Geiger's weakened physical and mental condition but not mental incapacity.

There is no evidence tending to show mental incapacity prior to Dr. Alden's examination, late in 1905, unless it is to be inferred from the condition which he claims to have found then and Dr. Andre soon after. Previous to that time no person appears to have observed any lack of mental power, and no witness has expressed the view that there was any such lack. After January, 1906, the next event appearing in the evidence is the making of the will, in August, 1906. The subscribing witnesses, who were acquaintances of Geiger, testified to his mental capacity at that time. In that same month the Chicago and Northwestern Railway Company was negotiating with Geiger for a right of way through his farm, running near his house. The negotiations were conducted on the part of the railroad company by Harry Warner, who talked with Geiger personally about it. Geiger was unwilling to accept any

amount which Warner was authorized to offer and finally referred the latter to Mr. Barge as Geiger's attorney. No agreement being reached a petition for condemnation was filed, but before trial the controversy was settled. Geiger made a conveyance to the railroad company on October 31, 1906, his wife, one of the contestants, joining in it, and $6000 in money was paid to him. Warner regarded him as of sound mind and a careful, prudent, conservative man.

Geiger was a depositor in the Dixon National Bank, and A. P. Armington, the cashier, who had known him for twelve or thirteen years, did business with him personally at the bank and had many conversations with him, testified that he was of sound mind. Armington sold him $2000 of telephone bonds in 1906, for which probably a part of the money received from the railroad company was used. More of it was probably used in the purchase of the Kansas land, which has already been referred to. Geiger was accompanied on this trip to Kansas by Wheeler and Henry Raffenberger, real estate dealers living, respectively, in Sterling and Dixon, who testified as to Geiger's visiting with them a number of different tracts, inspecting them personally, examining the soil and finally selecting two quarter sections, which he bought. One of the quarter sections he caused to be deeded as a gift to his son Walter, then nineteen years old, who accompanied him. No one then seems to have thought of any lack of mental capacity, and Wheeler and Raffenberger testified that Geiger was then of sound mind. Roy Raffenberger, a son of Henry, who was in business with him, testified to the same effect. He saw and talked with Geiger before the western trip, which lasted ten days, and many times after his return.

F. X. Newcomer, who was in the real estate, loan and insurance business in Dixon, knew Geiger about twelve years, loaned money for him, sold bonds to him and had many business deals with him. Between October 30 and November 5, 1906, he notified Geiger that the Harvey

property, on which Geiger had a loan, had been sold and the buyer wanted to pay the loan off, but Geiger said it was not yet due. Newcomer told him there was a privilege in the note—that he would have to accept the money. Geiger replied that he did not know about that but he would see, and in a few minutes he came back with the note, saying, "You are right; I will have to take the money; there is a privilege," and Newcomer thereupon gave him a check for the amount. In about thirty days after that Newcomer drove out to his house to see him about loaning some money, but Geiger told him he had bought some telephone bonds, being those sold him by Armington.

James Stitzel, who was a highway commissioner, testified particularly to a conversation with Geiger in September, 1906, about the hard road leading into Dixon and the necessity of repairing it, and also to other conversations. Henry Phillips testified to a visit to Geiger's home in 1907, when the latter told him about his first coming west, and his early experiences, his struggles, his early investments in land and his business principles. J. F. Palmer, an attorney of Dixon, who was acting as an appraiser of the right of way for the railroad company, had several talks with Geiger while the matter was pending, as well as before and after. Baker, a painter and paperhanger of Dixon, knew Geiger twenty-eight years and did a good deal of work for him, extending over a considerable period of time. These and a number of other witnesses, some of whose opportunities were not so good and others of whom were unable to fix times and whose opinions were therefore of less weight, gave their judgment that the testator was of sound mind. In all there were more than twenty witnesses, neighbors and acquaintances of the testator, who testified to his mental soundness. No one of his neighbors, nor anyone in the habit of seeing him often, testified to the contrary. Against these, besides the two doctors, are

the two real estate dealers in Sterling, the tailor in Hot Springs and the brother-in-law from Iowa, testifying to an occasional conversation or circumstance of little importance. Any other circumstances appearing in the evidence which might be referred to are as consistent with sanity as insanity. The opinion of the doctors as to the testator's mental condition in January, 1906, is inconsistent with the established facts as to his condition later in the same year. Neither old age nor feeble health constitutes mental incapacity, nor do both together, though combined with a defective memory and mental sluggishness.

The counsel for the appellees rely upon the fact that Walter accompanied his father on the Kansas trip, and that he or Thomas, or both, were present on various other occasions when the evidence shows that business was transacted by their father, and the inference is sought to be drawn that in such matters the son's was the controlling mind. But the evidence does not indicate it. Their mere presence cannot be regarded as evidence of their father's incapacity, and the evidence does not show that they transacted the business for their father other than under his direction. In 1906 Walter was a nineteen-year-old school boy, with no business experience, and while Thomas was five or six years older, there is nothing to indicate his capacity. The will itself contains no evidence of an unsound mind, but it does indicate that the testator believed his children should not have the direct control of his estate. The trust he attempted to create was within his legal power, and the fact that all the beneficiaries for whose protection it was created wish it destroyed does not make it any the less the duty of the trustee and the court to see that the will of the testator is carried out if he was mentally competent.

Nellie Geer has two children, neither of whom is a party to the bill. Upon her death these children, if living, will take under the will a part of the land. They are

interested in the suit and their interest is not represented by the trustee, whose title ceases before that of the children begins or the heirs who are seeking to set aside the will. They should be made parties.

In our judgment the verdict is so manifestly against the weight of the evidence that the decree must be reversed and the cause remanded.          *Reversed and remanded.*